UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 05-98-06-RE |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| JOSE NATIVIDAD RIOS-RUIZ, | |
| Defendant. | |

_____

REDDEN, Judge:

The matter before the court is Defendant Jose Natividad Rios-Ruiz's motion (doc. 257) to suppress his statements and all physical evidence seized by California Highway Patrol (CHP) during a traffic stop on February 25, 2005.  The court held oral argument and heard testimony on November 2, 2006, at which time the court DENIED Defendant's motion.[1]

_____

[1]At the November 2, 2006 hearing, the court heard testimony from Drug Enforcement Administration (DEA) Agents Lenard Olsen ("Olsen") and Jeff Poikey ("Poikey"), as well as California Highway Patrol (CHP) Investigator Jim Carter ("Carter").

PAGE 1 - OPINION AND ORDER

**Factual Background**

In June 2003, the Drug Enforcement Administration (DEA) initiated an investigation that targeted an organization involved in distributing multi-pound quantities of methamphetamine and cocaine in the Hillsboro, Oregon region. DEA believed the organization included three brothers: Ricardo, Octavio, and Marco Mendoza-Morales. Through confidential sources and subsequent surveillance, DEA also believed the Mendoza-Morales brothers were part of a large methamphetamine trafficking organization that obtained its supply directly from distributors in California and Mexico.

At the court's November 2, 2006 evidentiary hearing, DEA Special Agent Jeff Poikey ("Poikey") testified that based on informants' tips and hundreds of hours of surveillance, DEA believed Ricardo was responsible for making the arrangements to supply methamphetamine and cocaine for the organization. DEA surveillance and information obtained from informants revealed that Ricardo would often travel to California or Mexico to obtain narcotics. Frequently, Ricardo would send a courier to pick the narcotics up for him and transport them back to Oregon. On at least one occasion, DEA observed Ricardo "shadow," or follow, a courier to California to pick up narcotics. DEA arrested a courier, who explained to DEA that Ricardo would send money south to California and bring drugs back to Oregon in vehicles modified with hidden compartments. A cooperating offender told DEA that Ricardo regularly used vehicles with secret compartments to transport up to 40 pounds of methamphetamine from California and Mexico.

DEA observed several drug transactions involving Ricardo. On several occasions, undercover DEA agents purchased large quantities of methamphetamine from a cooperating

PAGE 2 - OPINION AND ORDER

offender, who admitted working for Ricardo.  Another cooperating offender admitted that he

regularly purchased 1 to 2 pounds of methamphetamine from Ricardo, identifying Ricardo as his

supplier and "the boss who controlled large amounts of methamphetamine."  Ricardo also had a

criminal history, which included several narcotic distribution offenses.

    DEA surveillance revealed that Ricardo had access to a stash trailer, where DEA believed

the Mendoza-Morales organization stored illegal narcotics.  Surveillance also connected Ricardo

to a location in Washington, at which law enforcement found 9 pounds of methamphetamine, 10

firearms, and two vehicles with modified hidden compartments.  Agent Poikey testified that

based information obtained through its investigation, DEA believed Ricardo was involved in

trafficking millions of dollars in narcotics.

    Based on specific surveillance, undercover purchases, and information obtained from

informants, Oregon District Court Judge Haggerty issued an order authorizing the interception of

Ricardo's telephone communications on February 18, 2005.  Judge Haggerty found that there

was probable cause to believe that Ricardo "and other conspirators, aiders, abetters, and

participants as yet unknown . . . have committed, and are committing, and will continue to

commit" violations involving the distribution, possession, and conspiracy to distribute controlled

substances.  The order specifically authorized interception of communications to and from

Ricardo's cellular phone.

    Beginning on February 23, 2005, DEA intercepted a series of calls between Ricardo and

Alfredo Lnu about the delivery of certain "bills."[2]  Ricardo told Alfredo that he was nervous

---

[2]Agent Poikey testified that based on several intercepted calls and statements by
informants, DEA suspected Alfredo Lnu to be a major distributor of narcotics in Mexico.  Based
on informants' statements and recorded conversations between a cooperating offender and

PAGE 3 - OPINION AND ORDER

about getting rid of the "bills."  From the transcripts of the calls, it appears Ricardo suspected,

correctly, that the police were watching him.  Ricardo told Alfredo that he needed to send

someone to come pick up the "bills" because "they're watching me again, . . . they're waiting for

me to leave my house."  Agent Poikey testified that DEA believed that Ricardo and Alfredo were

planning to exchange narcotics or money to buy narcotics, and trying to be covert about the

rendevous.

On the evening of February 23, 2006, Alfredo called Ricardo to tell him that a "guy"

would be there the next day at about 5:00 p.m. to pick up the "bills."  Alfredo also said "the guy"

could go pick up the "applications" later.[3]  Ricardo confirmed that he had eighty "pesos" that

belonged to Alfredo.

The next day, at approximately 4:30 p.m., Ricardo called Alfredo to confirm the meeting.

Again, Ricardo confirmed that he had eighty "pesos" for Alfredo.  Alfredo told Ricardo to be

careful because "the guy" was going to call soon.  Seven minutes later, Defendant Jose Natividad

Rios-Ruiz first contacted Ricardo.  Rios-Ruiz told Ricardo that he was calling on behalf of

Alfredo.  They agreed to meet immediately at 115 Canyon in Beaverton, Oregon.

The DEA wire intercepts indicate that Ricardo and Rios-Ruiz initially had some

difficulty locating one another.  At one point, Ricardo said that he was outside of his vehicle near

a Subaru dealership.  After several minutes of exchanging locations and giving Defendant

---

Mendoza-Morales, DEA believed that the words "bills" and "pesos" were code words for money.
The cooperating offender also told DEA that Ricardo did not like to use exact figures when
referring to quantities of narcotics or currency.

[3]Based on previously recorded conversations between a cooperating offender and
Ricardo, as well as information obtained from informants, DEA believed that "applications" was
a code word for narcotics.

directions, Ricardo located Defendant, confirming that Defendant was in a silver Chevrolet "Malibu." Ricardo told Defendant to follow him because it was difficult to "do it here."

As Ricardo and Rios-Ruiz were trying to locate one another, DEA agents monitoring the conversation dispatched field agents to the area. Just after 5:30 p.m., DEA agents saw Ricardo walking with a cellular phone near a Subaru dealership. Ricardo returned to his car and drove away, followed by a silver Chevy Malibu with Idaho license plate 1P40725. Agents followed the two vehicles to a parking lot at 110th Avenue in Beaverton, Oregon.

While in the parking lot, Ricardo stepped out of his vehicle and went to the trunk of his car and retrieved a red 2' x 2' package. He approached Defendant's Chevy Malibu carrying the package and got into front passenger seat. Shortly thereafter, Ricardo exited the vehicle without the package. Defendant then got out of the Malibu and placed the red package in the trunk. Ricardo drove to the north while DEA agents followed Defendant's vehicle to the south.

Defendant stopped at a Fred Myer's store, went inside, and returned with a white plastic grocery bag, which he placed in his trunk. After watching Defendant "messing around" with the red package, DEA agents followed Defendant as he proceeded south on I-5 to a Motel 6 in Eugene, where he spent the night after retrieving the white plastic bag from the trunk. DEA agents maintained surveillance of Defendant's Malibu through the night. At approximately 7:00 a.m. on February 25, 2006, Defendant returned to his vehicle carrying the white plastic bag, and again proceeded south on I-5 toward California.[4]

---

[4]At oral argument, DEA Agents Lenard Olsen and Jeff Poikey testified that they did not stop Defendant immediately after the meeting with Ricardo, or at the Motel 6 because they wanted to protect the ongoing investigation and wiretap. Olsen testified that DEA's investigation had revealed that Ricardo was conducting counter-surveillance, and DEA believed Ricardo would be suspicious if agents apprehended Defendant immediately after the "drop." Further,

PAGE 5 - OPINION AND ORDER

Defendant continued southbound on I-5 until he was stopped by California Highway Patrol (CHP) officers at approximately 12:35 p.m. near Redding, California.  Before CHP Officers stopped Defendant, DEA Agent Poikey, who was one of the lead investigators in the case, contacted CHP Liason Jeff Neiman in Sacramento, California, to discuss the situation. Shortly thereafter, Neiman asked CHP Investigator Jim Carter to contact DEA Agent Lenard Olsen.  Olsen told Carter that DEA was involved in a Title III wiretap investigation of several suspected narcotics traffickers, including Defendant.  Olsen also explained that surveillance led DEA to believe that Defendant's vehicle contained a large amount of currency related to illegal drug activity.  Olsen also told Carter that the money should be in the trunk of Defendant's car. Olsen provided Carter with Defendant's description, the make and model of his vehicle, and his license plate number.

Agent Olsen told Carter that DEA wanted to remain "walled off" from any stop of the vehicle to avoid "tipping" Defendant off to DEA's investigation of the Mendoza-Morales brothers.  Accordingly, Olsen asked Carter to develop his own probable cause for the stop. Carter's CHP report for the incident does not indicate whether DEA provided him with any specific information about DEA's investigation, or the package in the trunk.[5]

_____

DEA agents were waiting to see if Defendant stopped to deliver the package to someone else.
    Agent Poikey testified that DEA wanted to stop Defendant as far away from Portland and the Mendoza-Morales organization as possible to avoid "tipping" Ricardo or Rios-Ruiz off to the presence of a wiretap.  At the evidentiary hearing, Poikey testified that this tactic apparently helped obscure DEA's investigation.  Ricardo continued to use his cellular phone to conduct narcotics-related business after the government seized currency from Defendant's vehicle.

    [5]At the evidentiary hearing, CHP Investigator Carter testified that federal investigative agencies commonly asked to be "walled off" from a CHP stop and search of a particular vehicle to protect a federal investigation.  In such cases, CHP fills out an investigative report that specifically omits any mention of the federal investigation to avoid a paper trail, which might

At approximately 12:35 p.m., CHP stopped Defendant for traveling 70 miles per hour in a 65 mile per hour zone. CHP advised Defendant that he was stopped for speeding, and asked for license and registration. While a citation was being filled out for speeding, CHP Officer Heath Helman asked Defendant where he was going. Defendant told the officer that he was going to see his dying grandfather. Defendant stated that he was staying for a week, but when Helman noted that Defendant was not carrying any luggage, Defendant stated he was only staying for two days. Officer Helman also noticed Defendant was nervous and fidgeting. He asked Defendant to step out of the vehicle, and asked him if he had and guns, drugs, or money in the vehicle. Defendant said "no."

Approximately eight minutes after the initial stop, CHP brought a canine unit to sniff the exterior of the vehicle. The dog alerted to the exterior of the vehicle near the left rear wheel well. Based on the canine alert, CHP searched the interior and trunk of the vehicle, and discovered a purple plastic bag containing six duct taped bundles. Ultimately, the officers recovered seventeen duct taped bundles containing U.S. currency, which totaled $84,900. Based on their experience and training, CHP determined that the currency was packaged in a manner consistent with illegal contraband and seized it.

On March 9, 2005, Mr. Rios-Ruiz was indicted along with nine co-defendants with conspiracy to possess with intent to distribute more than 500 grams of methamphetamine and more than five kilograms of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 853. Based on the distinct factual circumstances of Defendant's alleged involvement in the conspiracy, the court severed his trial from the co-defendants.

---

jeopardize the federal investigation.

PAGE 7 - OPINION AND ORDER

**Motion to Suppress**

Defendant moves for a court order suppressing all evidence seized by CHP during their warrantless search of his vehicle.  Defendant contends that the evidence should be suppressed because: (1)  CHP unlawfully expanded the traffic stop and illegally detained and questioned Defendant without reasonable suspicion in violation of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968); (2) CHP cannot point to any specific and articulable facts that support a finding of probable cause to search Defendant's vehicle and trunk; and (3)  the canine alert in this case was inherently unreliable, and therefore cannot support a finding of probable cause.

On May 4, 2006, the court granted the government's motion to bifurcate briefing to first address whether DEA and CHP had probable cause to stop Defendant and search his vehicle without considering the dog sniff evidence.  The government contends that regardless of the dog sniff evidence, CHP had probable cause to stop and search Defendant's vehicle based on the "collective knowledge" gained through DEA agents who requested the stop.

**Discussion**

The Fourth Amendment to the U.S. Constitution protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A traffic stop is a seizure within the meaning of the Fourth Amendment.  <u>United States v. Hensley</u>, 469 U.S. 221, 226 (1985).  Due to an automobile's inherent mobility, a police officer may stop an automobile and search the passenger compartment of the vehicle without a warrant if the officer has a reasonable suspicion that its occupants are involved in criminal activity.  <u>Id</u>. In order to search a vehicle's trunk without a warrant, however, an officer must have probable cause to believe that the automobile contains evidence of a crime.  <u>United States v. Alvarez</u>, 899

F.2d 833, 839 (9th Cir. 1990); see also Maryland v. Dyson, 527 U.S. 465, 467 (1999) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth amendment . . . permits police to search the vehicle without more." (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)).

Probable cause to search is evaluated in light of the totality of circumstances and exists if there is a fair probability that contraband or other evidence of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. 213, 238-39 (1983). Probable cause to arrest exists when law enforcement officers possess knowledge of facts and circumstances sufficient to warrant a reasonable belief that the suspect has committed, or is committing a crime. United States v. Wallace, 213 F.3d 1216, 1220 (9th Cir. 2000). Although the test for probable cause is an objective test, the court may take into account the experience and expertise of law enforcement agents who observed the defendant's activity. Terry v. Ohio, 392 U.S. 1, 21-22 (1968); United States v. Valencia, 24 F.3d 1106, 1108 (9th Cir. 1994).

The Ninth Circuit has repeatedly held that "[p]robable cause can . . . be demonstrated through the collective knowledge of police officers involved in an investigation, even if some of the information known to the other officers is not communicated to the arresting officer." United States v. Butler, 74 F.3d 916, 921 (9th Cir. 1996); Valencia, 24 F.3d at 1108; United States v. Sutton, 794 F.2d 1415, 1426-27 (9th Cir. 1986). Indeed, "[t]he accepted practice of modern law enforcement is that an officer often makes arrests at the direction of another law enforcement officer even though the arresting officer himself lacks actual, personal knowledge of the facts supporting probable cause." United States v. Jensen, 425 F.3d 698, 704 (9th Cir. 2005); see also Sutton, 794 F.2d at 1426-27 (upholding the validity of a stop made by a local Sheriff's Deputy

PAGE 9 - OPINION AND ORDER

responding to a U.S. Customs' request to stop a vehicle at an abandoned airfield, which U.S.

Customs had probable cause to believe was being used as a "drop site" for illegal narcotics);

United States v. Ibarra-Sanchez, 199 F.3d 753, 759-60 (5th Cir. 1999) (upholding the validity of

a stop made by a local police officer responding to a DEA request for assistance in stopping a

van, which DEA believed was being used to smuggle drugs).

When determining whether a particular stop is supported by probable cause, the Ninth

Circuit has "look[ed] to the collective knowledge of all the officers involved in the criminal

investigation," and not simply the discrete knowledge of the "officer who actually makes the

stop." Sutton, 794 F.2d at 1426. In effect, officers conducting an investigatory stop are entitled

to rely on the observations and knowledge of all other law enforcement agents "involved in the

investigation and all of the reasonable inferences that may be drawn therefrom." United States v.

Hoyos, 892 F.2d 1387, 1392 (9th Cir. 1989), *overruled on other grounds by* United States v.

Ruiz, 257 F.3d 1030 (9th Cir. 2001).

Here, the totality of circumstances demonstrates that prior to the stop of Defendant's

vehicle, the collective knowledge of all the law enforcement agents involved in the investigation

was adequate for a reasonable person to believe that Defendant's vehicle contained evidence of a

narcotics-related crime. Gates, 462 U.S. at 238-39. Whether CHP's subsequent observations and

the dog sniff would have supported a finding of probable cause to search Defendant's vehicle is

irrelevant.

Based on hundreds of hours of physical surveillance, wire intercepts, statements of

informants, and controlled narcotics transactions, DEA had a substantial basis to believe that

Ricardo Mendoza-Morales was trafficking narcotics. Indeed, Defendant acknowledged that

PAGE 10 - OPINION AND ORDER

DEA had probable cause to believe Ricardo Mendoza-Morales was a drug trafficker.

Before ordering the stop of Defendant's vehicle, DEA intercepted a series of calls between Ricardo and another suspected narcotics trafficker, Alfredo Lnu, about the delivery of eighty "bills." DEA Agent Poikey explained that based on his experience, the wiretaps, and information obtained from informants, he believed that "bills" was a code word for money and Ricardo and Alfredo were attempting to exchange money to buy narcotics. Poikey testified that Ricardo was very concerned the police were watching him, and he believed Ricardo and Alfredo were using code language in an effort to be covert about the rendevous. Alfredo agreed to send a "guy" to pick up the "bills" the next day at approximately 5:00 p.m. DEA noted this was consistent with earlier surveillance and information obtained by informants, which suggested Ricardo frequently sent couriers to California and Mexico with cash to purchase narcotics and bring them back to Oregon.

The next day, at approximately 4:30 p.m., DEA intercepted a series of calls between Defendant and Ricardo. Defendant told Ricardo that he was calling on behalf of Alfredo. DEA noted that the timing of Defendant's calls coincided almost precisely with the time that Alfredo had told Ricardo "the guy" would call to pick up the "bills." The conversation revealed Ricardo's precise location. DEA immediately dispatched agents to the area, where they observed Ricardo get into Defendant's car with a red 2'x2' package, and then get out of the vehicle without the package. Based on these objective facts and the experience and expertise of the agents involved in the investigation, DEA drew a rational inference that Defendant was "the guy" that Alfredo sent to pick up the "bills."

Prior to the search of Defendant's vehicle, DEA Agent Olsen contacted CHP Investigator

Carter to request CHP's assistance in stopping the vehicle. Olsen told Carter that based on physical and electronic surveillance, DEA believed Defendant was carrying contraband currency. Olsen provided Carter with Defendant's physical description, the make and model of his vehicle, and his license plate number. Olsen told Carter that he should find a red package containing contraband currency in the trunk of Defendants car.

The information DEA obtained through surveillance and informants, the timing and content of the wire intercepts, and DEA's specific observation of Ricardo giving a 2'x2' package to Defendant clearly supports the conclusion that DEA had sufficient probable cause "to believe [Defendant's vehicle] contained contraband." Labron, 518 U.S. at 940. Even though the CHP Officers who actually stopped and searched Defendant's vehicle may not have had personal knowledge of every aspect of the federal investigation, they were entitled to rely on the collective knowledge of all law enforcement agents involved in the investigation. Butler, 74 F.3d at 921; see also Illinois v. Andreas, 463 U.S. 765, 772 n.5 (1983) ("[W]here law enforcement authorities are cooperating in an investigation . . . , the knowledge of one is presumed shared by all."). Because DEA had probable cause to search Defendant's vehicle for contraband, CHP—as an "extension" or agent of DEA—also had probable cause to search Defendant's vehicle for contraband.

Defendant argues that the protracted manner in which the search was conducted belies the government's claim of collective knowledge. Defendant contends that had CHP had probable cause to believe there was contraband in the trunk, they would not have bothered with a dog sniff and a search of the interior of the vehicle. I disagree. CHP Officers on the scene need not have been aware of every detail of the federal investigation (such as the exact location of the

PAGE 12 - OPINION AND ORDER

contraband) to rely on the collective knowledge of all of the officers involved in the investigation. Jensen, 425 F.3d at 704-05. The fact that DEA asked CHP to develop their own probable cause to search in order to avoid tipping Rios-Ruiz off to the investigation does not negate the fact that the DEA agents had independent probable cause to search the car. Cf. Ibarra-Sanchez, 199 F.3d at 759-60.

I also disagree with Defendant's position that DEA lacked probable cause to search Defendant's vehicle because the seized currency could have come from a legitimate source. Law enforcement officers are not required to rule out every possibility of innocent behavior before conducting a warrantless search based on probable cause. United States v. Holland, 510 F.2d 453, 455 (9th Cir. 1975). Moreover, the history of Ricardo's use of drug couriers, the content of phone calls between Alfredo and Ricardo, the timing of Defendant's contact with Ricardo, the observation of Ricardo delivering a package to Defendant, and the rational inferences DEA agents drew from those objective facts and their own experience collectively give rise to an objectively reasonable belief that Defendant was transporting contraband in his vehicle.

## Conclusion

For the reasons stated above, Defendant's motion (doc. 257) to suppress his statements and all physical evidence seized by CHP during a February 25, 2005 traffic stop is DENIED.

IT IS SO ORDERED.

DATED this  22nd  day of November, 2006.

 /s/ James A. Redden
                James A. Redden
                United States District Judge

PAGE 13 - OPINION AND ORDER